Argued June 25, reversed with instruction October 4,
petition for rehearing denied November 23, 1971,
petition for review denied February 8, 1972

# CARNATION COMPANY, *Appellant, v.*
# DEPARTMENT OF AGRICULTURE, *Respondent.*

### 488 P2d 1385

*James H. Clarke,* Portland, argued the cause for appellant. With him on the briefs were McColloch, Dezendorf, Spears & Lubersky, Portland.

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Jacob B. Tanzer, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and FOLEY and THORNTON, Judges.

FOLEY, J.

This is an appeal by petitioner, Carnation Milk Company, from a decree of the Marion County Circuit Court which affirmed, without opinion, certain orders made as a result of Audit Findings of the Department of Agriculture. This appeal is taken under ORS 583.096 and the issue is whether the defendant Department of Agriculture has abused its discretion in interpreting its own regulation, OAR 603-66-030, and ORS 583.007 (1) concerning the reclassification of certain milk products.

The Department of Agriculture Audit Findings and Reaudit Findings of the Carnation Milk Company for the periods from December 1, 1966, to November 30, 1967, and from December 1, 1967, to November 30, 1968, resulted in orders increasing the amount of money owed by Carnation to the Oregon market pool by $10,597.67 and $21,825.85 for the two periods respectively. There is no dispute over the accuracy or completeness of Carnation's records or the amount of money in dispute. Both of these matters were stipulated between the parties.

A brief discussion of the milk market pool is

necessary to an understanding of the issue. Under the statewide market pool, which the Department has operated since October 1, 1963 (Oregon Laws 1963, ch 442), milk producers are paid for their milk through the pool at fixed minimum prices established by the Department according to the uses to which it is put by milk handlers, such as Carnation. Under the 1967 Act (Oregon Laws 1967, ch 440) and regulations thereunder, which became effective July 1, 1967 (OAR 603-66-030), three classes of use are recognized and a fixed minimum producer price is established for each Class: Class 1 (fluid use); Class 2 (manufacturing use, including cottage cheese, ice cream and frozen desserts); and Class 3 (other manufacturing uses, including butter, other cheeses and powdered milk, milk disposed of for livestock feed or dumped, and plant loss up to 2 per cent). The Class 1 price is the highest and the Class 3 price is the lowest of the three fixed minimum prices. The basic principle of the market pool is that all high-value utilization of pool milk should be shared proportionately by all pool producers Milk producers are given a volume of milk to deliver to the market and are paid, primarily, according to the high utilization use of their percentage of the pool milk. Milk which they deliver in excess of the quota is usually paid for at the lower Class 3 and Class 2 utilization.

The pool price of Class 3 milk was $.45 per hundredweight lower than it was for Class 2 milk during the period involved herein. The additional amounts assessed against Carnation are a result of the Department's refusal to permit reclassification downward of two milk products—whey and certain aged cottage cheese. The parties stipulated that the cottage cheese and whey involved in this proceeding

are "milk" within the meaning of the Act. If ordinary cottage cheese were involved, it is clear that both Oregon Administrative Rules, ch 603, § 66-030 (OAR 603-66-030)[1] and ORS 583.007 (1)[2] would put cottage

[1] Oregon Administrative Rules ch 603, § 66-030 (8-15-67):

"All handlers or producer-handlers shall classify all Grade A or Grade B milk received or produced according to usage or sales for usage as follows:

"(1) Class 1 milk shall be all milk or butterfat:

"(a) processed and/or bottled or packaged and sold to consumers, stores or jobbers, or sold in bulk form without processing or bottling to other handlers or producer-handlers, for ultimate human consumption in fluid form or as a constituent part of a product sold in fluid form; or

"(b) sold or disposed of as a milk product as defined in OAR 603-61-005 (11). In the event such milk or butterfat is reconstituted or recombined in order to be so sold or disposed of, then in such event the fluid volume of the ultimate reconstituted or recombined milk product shall be so classified less the volume of the non-milk substitutes or additives thereof; or

"(c) contained in pooling period inventory variations; or

"(d) in actual shrinkage, plant loss or overuse in excess of 2% of the total receipts of Grade A or Grade B milk; or

"(e) not specifically accounted for under Class 2 or Class 3 use.

"(2) Class 2 milk shall be all milk or butterfat:

"(a) used or sold for use in the manufacture of:

"(A) all types of cottage cheese;
"(B) ice cream or ice cream mix;
"(C) frozen desserts containing milk or butterfat;
"(D) yogurt;
"(E) condensed milk;
"(F) evaporated milk;
"(G) egg nog;
"(H) sour cream.

"(b) sold to bakeries, soup companies, candy manufacturing establishments and specialty manufacturers for use in their capacity as such.

"(3) Class 3 milk shall be all milk or butterfat:

"(a) used or sold for use in the manufacture of:

"(A) butter;
"(B) cheeses other than cottage cheese;

"(C) powdered milk.

"(b) disposed of for livestock feed;

"(c) dumped after such prior notice and opportunity for verification as may be required by the department;

"(d) in actual shrinkage, plant loss or overuse not in excess of 2% of the total receipts of Grade A or Grade B milk.

"(4) All milk and butterfat shall be classified as Class 1 unless the first handler proves that such milk and butterfat should be classified as Class 2 or Class 3, and:

"(a) the burden shall rest upon such handler to establish the sources and use classification of all milk required to be reported by such handler;

"(b) any milk or butterfat classified in one class shall be reclassified if used or reused by any handler in another class;

"(c) Class 1 milk that has been processed and bottled shall be the Class 1 sale of the handler or producer-handler who processed and bottled such milk, except for custom processed milk as provided by Section 3, chapter 440, OL 1967, and shall not be considered the Class 1 sale of a jobber, handler or producer-handler who purchases the milk already processed and bottled;

"(d) in the event a handler buys a portion of his bottled milk already in the bottle as jobber milk, any returns from such milk shall not be recorded as returns and subtracted from bottling in arriving at his net Class 1 sales. If such returns are returned to the handler who originally bottled the milk they may be accounted for by that handler as if they were returns from his own Class 1 sales."

② ORS 583.007 (1):

" 'Classification' means the classification of all Grade A and Grade B milk into classes according to its utilization.

"(a) 'Class 1 milk' includes but is not limited to Grade A and Grade B milk received, used or sold to others for ultimate use man consumption in fluid form.

"(b) 'Class 2 milk' includes but is not limited to Grade A and Grade B milk received, used or sold to others for ultimate use in the manufacture of cottage cheese, ice cream, condensed milk and the frozen desserts as shall be prescribed by the department under this chapter.

"(c) 'Class 3 milk' means all the Grade A and Grade B milk received, used or sold to others, for use other than that prescribed for Class 1 and Class 2 milk.

"(d) In addition to the classifications under paragraphs (a) to (c) of this subsection, the department under this chapter may by rule classify, within the above classes, any Grade A or Grade B milk received, used or sold to others, that has not been defined herein."

cheese squarely into a Class 2 use with the resultant higher price to be paid by Carnation for this utilization of the milk. However, the cottage cheese in question here was aged and returned from the grocers' shelves. Instead of selling this to a store as cottage cheese, a Class 2 use, Carnation reused it by selling it in its overaged form to livestock producers for livestock feed. Petitioner claims that this reuse of the cottage cheese requires that it be reclassified from Class 2 cottage cheese downward to a Class 3 usage, in accordance with OAR 603-66-030 (4)(b). By such a reclassification downward, petitioner would be entitled to a refund from the milk pool.

In addition to the request that this particular cottage cheese, which was ultimately used for feed, be reclassified downward, the plaintiff sought to have a large quantity of whey also reclassified downward from a Class 2 to a Class 3 use. Whey is a by-product of producing cottage cheese. Technically, it is milk from which the butterfat and casein have been removed. The Department of Agriculture wishes to classify this whey, along with cottage cheese, as a Class 2 use. Petitioner contends that the particular whey in question was used as livestock feed and the bulk of it was just thrown away—dumped. Petitioner claims that this is a Class 3 use, as per OAR 603-66-030 (3).

We review administrative proceedings for errors of law and on factual findings by determining whether or not there is substantial evidence to support the findings. *Wright v. Bateson,* 5 Or App 628, 634, 485 P2d 641 (1971); *Bay v. State Board of Education,* 233 Or 601, 378 P2d 558, 96 ALR2d 529 (1963). Here there is no factual dispute, so our review is limited to interpretation of the applicable statutes and regulations and "protection against arbitrary or capricious action or

abuse of discretion." 4 Davis, Administrative Law Treatise 114, § 29.01 (1958). This case involves a claimed abuse of discretion by the defendant in interpreting its rules, and thus is in the ambit of our review.

In oral argument the respondent Department of Agriculture stated:

> "Since we adopted the rule we know what we meant, we can interpret it."

It also said in its brief:

> "* * * The Department has applied its regulation to require that once the raw milk is committed to one of the classified utilizations the bulk raw milk should be paid for at the price set for that utilization. * * *"

In other words, the Department wants to limit reclassification to raw whole milk or butterfat while refusing to allow a reclassification for whey and spoiled or aged cottage cheese.

The limit of reclassification as to raw whole milk or butterfat is not justified, nor is it explained, and appears to be contrary to the language of the regulation which says:

> "[A]ny milk or butterfat classified in one class shall be reclassified if used or reused by any handler in another class * * *." OAR 603-66-030 (4) (b),

and:

> "Class 3 milk shall be all milk or butterfat:
> "* * * * *
> "(b) disposed of for livestock feed;
> "(c) dumped after such prior notice and opportunity for verification as may be required by the department;
> "* * * * *" OAR 603-66-030 (3).

The words of the Department's own regulation are explicit in using the words "any milk or butterfat" and "all milk or butterfat" instead of the suggested limitation to raw bulk milk. To substitute raw bulk milk would make the word "reused" superfluous, for how could a handler reuse raw bulk milk which has not yet even been committed to a first use? Moreover, the parties have stipulated that the milk in question means cottage cheese which is aged and whey.

It is undisputed that the agency could have enacted a separate rule which would have limited the reclassification to raw bulk milk, but it did not do so. Instead, it made an interpretation of its own regulation, which is contradictory. Indeed, the Department's own practices show its own interpretation has not been applied consistently. Bottled milk which is returned from the grocers' shelves is and always has been reclassified. Yet this is not raw bulk milk.

The Department urges that its interpretation of the regulation is reasonable because:

" '* * * The term "use" or "used" * * * is not required to be read as one of literalness or consumptive ultimacy, but it is entitled to be given a practical regulatory significance in relation to handlers' processes and the effect of their mode of doing business upon the market problem.' *Bailey Farm Dairy Co. v. Anderson*, 157 F.2d 87, 94, (8th Cir. 1946)."

The sentence left out by the ellipses in the defendant's quotation from this case negates much of its own argument. The sentence which belongs there is:

"It is the handler's actual utilization of milk that controls the operation of the formula." 157 F2d at 94.

■ We hold that the Department's interpretation and practice is inconsistent with the plain meaning of the regulation and cannot be upheld.

■ We are not unmindful that an agency's discretion in interpreting its own regulations must be given great weight; however, the Department's interpretation is "only one input in the interpretational equation." *Zuber v. Allen,* 396 US 168, 24 L Ed 2d 345, 90 S Ct 314 (1969), and the administrative interpretation is not controlling if it is plainly erroneous and inconsistent with the regulation. *Thorpe v. Housing Authority,* 393 US 268, 89 S Ct 518, 21 L Ed 2d 474 (1969).

Reversed with instructions to the trial court to enter judgment in accordance with this opinion. Petitioner is entitled to costs, disbursements and reasonable attorney's fees pursuant to ORS 583.146.

THORNTON, J., dissenting.

Analyzing as a whole the Oregon Milk Audit and Stabilization Law and the regulations adopted by the State Department of Agriculture to implement that law, it appears the entire price classification scheme is based on the initial usage to which the handler places the raw bulk milk. Once the handler commits the raw bulk milk to a particular use (class 1, 2 or 3), that use is conclusive, with one exception hereinafter discussed.

ORS 583.007 (1)(b) provides:

"'Class 2 milk' includes * * * Grade A * * * milk * * * *used* or sold to others for ultimate use in the *manufacture* of cottage cheese * * *." (Emphasis supplied.)

Oregon Administrative Rules ch 603, § 66-030 (2) (a) (8-15-67), provides:

> "(2) Class 2 milk shall be all milk or butterfat:
> "(a) *used* or *sold* for use in the *manufacture* of:
> "(A) all types of cottage cheese;
> "* * * * *." (Emphasis supplied.)

Plaintiff corporation committed a certain volume of skim milk to the manufacture of cottage cheese, a class 2 utilization under the Oregon law and departmental regulations. It now contends that it should be allowed a reclassification (and a refund) for the whey which results from the manufacturing process, plus a refund for the unused cottage cheese returned from the grocers' shelves, both of which then had to be used for animal feed or dumped. I do not believe that these subsequent events constituted a recommitment by the handler of the original skim milk to a new utilization within the meaning of the exception in OAR 603-66-030 (4)(b).

As I read OAR 603-66-030 (4)(b), the disputed regulation,[1] the term "used or reused by any handler in another class" means that when bulk raw milk originally committed by the handler to one utilization is recommitted in the handler's plant to another utilization in a different classification, the regulation requires that it should be reclassified to the new utilization, and not otherwise.

The term "used and reused" in the above regulation is a term of art. As was pointed out in *Bailey Farm Dairy Co. v. Anderson,* 157 F2d 87, 94, *cert*

---

[1] OAR 603-66-030 (4)(b):
"* * * [A]ny milk or butterfat classified in one class shall be reclassified if used or reused by any handler in another class * * *."

*denied* 329 US 788, 67 S Ct 355, 91 L Ed 675 (8th Cir 1946):

"* * * The term 'use' or 'used' * * * is not required to be read as one of literalness or consumptive ultimacy, but it is entitled to be given a practical regulatory significance in relation to handlers' processes and the effect of their mode of doing business upon the market problem * * *."

Similarly, in *Queensboro Farms Products, Inc., v. Wickard,* 137 F2d 969 (2d Cir 1943), the court considered the meaning of terms "use" and "use classification" of milk under a federal marketing order. There the milk handler shipped cream, which was classified as a class 1 use, from its plant to a purchaser who eventually used it in the manufacture of ice cream, a class 2 use. The court upheld the action of the Secretary of Agriculture in retaining the class 1 classification, holding that the ultimate use by the purchaser was not the criteria but rather the form it was in when disposed of by the handler.

## STATUS OF THE SKIM MILK WHEY

Whey results from the manufacture of cottage cheese. It is a residue of the manufacturing process. It is not a reuse of the original skim milk by the handler in a new utilization in his own plant. An example of reuse would be the following: Taking raw whole milk, separating the cream therefrom for ice cream manufacturing, and then using in the handler's own plant the skim milk remaining in standardizing its fluid bottled milk for sale to grocers. This was not the case here. Plaintiff can no more claim an offset for this than it can for any other residues drained off in the same manufacturing process. The fact that the whey was then sold for animal feed or that some of it had to

be dumped *was not a reuse of milk by the handler in another class in its own plant.* This does not and did not change the classification once established.

As in *Queensboro Farm Products, Inc. v. Wickard,* supra, what a subsequent purchaser used it for is not the basis for classification or reclassification. Suppose the subsequent purchaser had used it to manufacture wine vinegar, to cite a hypothetical example. This still would not have changed the original classification. The plaintiff's plant is the location where the classification is determined. The plant of a livestock feed manufacturer or hog raiser to whom plaintiff may have sold the whey and returned cottage cheese, for example, is not the location of this bulk skim milk for purposes of this classification. The ultimate use by the purchaser is not the criteria. *Queensboro Farm Products, Inc. v. Wickard,* supra.

## STATUS OF THE
## OVERAGED OR SPOILED COTTAGE CHEESE

The fact that some of the cottage cheese spoiled before it was taken from the grocers' shelves and had to be returned to the handler and was then sold for animal feed or dumped again did not change the classification once established. It was not a use or reuse *at the plant* of the original skim milk in a different class.

The majority opinion places great stress on plaintiff's allegation that the Department had long allowed a reclassification for fluid milk returned from the grocers' shelves, and thereafter sold for animal feed or dumped. This practice appears on its face to be inconsistent with the Department's present position in refusing the reclassification as to the returned

cottage cheese. The record and briefs offer no explanation of the Department's reason or justification for this asserted difference in treatment. One possible reason could be this: That because this was the long-established practice in the industry under the old two-price system it became a part of the price structure, i.e., it was taken into consideration by the Department in establishing the price for class 1 utilization. In any event in the present posture of the case at bar the fact that the Department has always allowed a credit for returned milk, apparently in conflict with the disputed regulation, would not in my view authorize this court to direct that another exception be made in favor of whey and returned cottage cheese.

Plaintiff's claim of "lack of equity and fair play" resulting if it is not allowed this reclassification, does not stand up. The 'losses,' if they can be called such, were presumably already taken into account (1) by the Department of Agriculture in establishing a substantially lower producer price for milk used in the class 2 utilization, and (2) by the plaintiff itself in taking these 'losses' into consideration in establishing the retail price for its cottage cheese. Granting the reclassification requested by plaintiff would in effect be giving plaintiff a substantial monetary windfall at the expense of the milk producers to which plaintiff is not legally or equitably entitled.